IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NYKETIA Y. HARRISON,                )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        CIVIL ACTION NO. 1:05CV856-SRW
                                    )                (WO)
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )
            Defendant.              )

## MEMORANDUM OF OPINION

Plaintiff Nyketia Y. Harrison brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1381(c)(3)  seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for Supplemental Security Income under the

Social Security Act.  The parties have consented to entry of final judgment by the Magistrate

Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by

the parties, the court concludes that the decision of the Commissioner is due to be reversed.

## BACKGROUND

On June 23, 2003, plaintiff filed an application for Supplemental Security Income.

On September 27, 2004, after the claim was denied at the initial administrative levels, an ALJ

conducted an administrative hearing.  The ALJ rendered a decision on January 19, 2005.  The

ALJ concluded that plaintiff suffered from the severe impairment of mild mental retardation.

(R. 21).  He found that plaintiff's impairment did not rise to the level necessary to meet or

equal the criteria set forth in Listing 12.05C and, further, that plaintiff retained the residual

functional capacity to perform work existing in significant numbers in the national economy.[1]

Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social

Security Act.  On July 15, 2005, the Appeals Council denied plaintiff's request for review

and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.

Factual findings that are supported by substantial evidence must be upheld by the court.  The

ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985

F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis

has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

---

[1] The ALJ found that plaintiff had no past relevant work.  (R. 25).

Background

Plaintiff was twenty years old at the time of the hearing before the ALJ.  (R. 197).

She attended school through the eleventh grade.  (R. 197-98).  She was in special education

classes from 1992 through 1996, and also was enrolled in speech classes.  (R. 115).  She has

never worked, except for a two-month period during which she babysat part-time in her

mother's home.  (R. 205-06).  In November 1992, when plaintiff was eight years old, the

Geneva County Schools administered the Wechsler Intelligence Scale for Children - Revised

(WISC-R) to plaintiff, resulting in a Verbal IQ score of 54, Performance IQ of 91 and Full

Scale IQ of 71.   Three years later, administration of the WISC-III yielded a Verbal IQ score

of 57, Performance IQ of 79 and Full Scale IQ of 65.  WISC-III testing in April 1997 by the

Enterprise City Schools, when plaintiff was thirteen, yielded a Verbal IQ score of 57,

Performance IQ of 74 and a Full Scale IQ score of 63. (R. 134).

On April 15, 2002, fourteen months before she filed the present application for

benefits, plaintiff reported to the emergency room at Wiregrass Medical Center complaining

of lower back pain since the previous evening.  She was released with a prescription for

Naprosyn and instructions to apply heat and follow up with her regular physician.  (R. 169-

71).

On September 15, 2003, plaintiff reported to clinical psychologist Fred George for a

consultative examination. Dr. George administered the Wechsler Adult Intelligence Scale-III

test to plaintiff.  She had a Verbal IQ score of 67, a Performance IQ score of 68, and a Full

Scale IQ score of 65.  (R. 141-42).  Plaintiff told Dr. George that she hears people calling her

name several times a day, and that she is afraid to go to sleep "because when she wakes up she hears voices that sound like dead people trying to tell her to do something about herself." (R. 141). She reported that her mood was "depressed" and "indicated she had been depressed on a daily basis since her mother had chosen her husband over her when she was 13." (Id.). Plaintiff told Dr. George that she "has difficulties with her temper, gets mad and throws things. She breaks dishes and other breakable things approximately once a week." (R. 140). She indicated "symptoms of depression including crying easily, feeling lonely, loss of interest in activities, feeling hopeless about the future, difficulties motivating herself, feeling worthlessness, problems falling asleep, sleep that is restless and disturbed, memory problems, and concentration problems." (Id.). Plaintiff reported problems since kindergarten with impulsivity, overactivity, and concentration. Plaintiff's aunt, who accompanied her to the examination, rated plaintiff has having "9 of 9 symptoms of impulsivity and overactivity and 7 of 9 symptoms of inattention." (Id.). Plaintiff's aunt further indicated that plaintiff has "an explosive temper which she loses often, argues with adults, is often defiant, and is often angry." (Id.). Dr. George concluded, "Ms. Harrison has the intellectual and memory ability to perform a number of unskilled occupations. She would be severely impaired in her ability to relate [to] co-workers and supervisors, and cope with job stresses and job changes because of her anger control difficulties, impulsivity, and her depression." (R. 142). He recommended that she receive further evaluation and treatment of her "difficulties with inattention, impulsivity, overactivity, depression, and anger control problems." He noted that the prognosis for her benefitting from mental health treatment within the next six to twelve months was "fair," and suggested that she be referred to Vocational Rehabilitation Services

4

"[f]ollowing resolution or significant improvement of her difficulties[.]" (R. 142-43).

Two weeks later, plaintiff sought treatment at Samson Primary Care, complaining of sleep problems. She stated that it takes three to four hours before she is able to fall asleep, and that she had experienced frequent awakenings for two months. She stated that her mother left her when she was six months old and that, at age sixteen, she became reacquainted with her mother. She indicated that she wanted to discuss her "depression, anger, hyper" and told the provider that she occasionally throws things when at home to relieve her anger "but it doesn't help." (R. 145). She was diagnosed with "anxiety-[depression]," sleep disorder (probably secondary to the anxiety-depression), allergic rhinitis, and headache. (R. 144). The doctor referred her to SpectraCare for counseling and noted, "Re[check] in 1 wk - consider start antidep." (Id.).[2]

On June 30, 2004, plaintiff reported to the Wiregrass Medical Center emergency room complaining of pain in her right knee that had been "giving her trouble all her life." (R. 179). She denied any injury to her knee and reported that her pain was at a level 10 on a scale of 10. She reported that the pain was exacerbated by ambulation and that nothing relieved the pain. (R. 179-180). An X-ray of the knee was unremarkable. (R. 182). Plaintiff was released with instructions to take Aleve twice a day. She was also told that she "may call and set up appt with Dr. Beranek for orthro follow up." (R. 177).

Listing 12.05C

---

[2] Plaintiff testified that she went to SpectraCare one time, but that "Gwen" was charging her and she could not keep her appointment because she did not have the money to pay for it. (R. 203).

Plaintiff contends that the evidence demonstrates that she meets Listing 12.05C and that the ALJ's conclusion to the contrary is in error.  For a claimant to be found disabled under any part of Listing 12.05, she must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" and, in addition, meet one of the four requirements described in subparagraphs A through D.  See Listing 12.00A.  Listing 12.05C requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  The standard for an "additional and significant" limitation is the same as for a "severe" impairment under 20 C.F.R. 404.1520(c).[3]

In considering whether plaintiff met Listing 12.05C, the ALJ apparently determined that plaintiff has the requisite IQ scores to satisfy the listing.  (R. 21).  However, he concluded that she did not meet or equal the listing because she does not have a physical or other mental impairment imposing an additional and significant work-related limitation of function, *i.e.*, that she did not have another "severe" impairment.  (Id.).

An impairment is "severe" if it "significantly limit[s] [a claimant's] physical or mental

_____

[3] Under earlier versions of the regulation as interpreted by the Eleventh Circuit, the "additional and significant" standard was lower than the "severe" standard.  See Edwards v. Heckler, 755 F.2d 1513, 1515-16 (11th Cir. 1985); see also Davis v. Shalala, 985 F.2d 528, 531-32 (11th Cir. 1993).  Plaintiff argues that this is still the case.  See Plaintiff's brief, p. 10.  However, the Commissioner has modified introductory paragraph 12.00A and Listing 12.05C to clarify that the additional physical or mental impairment must be "severe."  See 65 Fed. Reg. 50,746 at 50,754  (Aug. 21, 2000)("In final listing 12.05C . . . we used the word 'an' before the word 'additional' to clarify that the additional impairment must be 'severe' in order to establish 'an additional and significant work-related limitation of function.'"); id. at 50772 ("We have always intended the phrase [significant work-related limitation of function] to mean that the other impairment is a 'severe' impairment, as defined in §§ 404.1520(c) and 416.920(c). . . . Therefore, . . .  we revised the fourth paragraph of final 12.00A, which explains how we assess the functional limitations of an additional impairment under listing 12.05C.").

ability to do basic work activities." 20 C.F.R. § 416.921(a).  "Basic work activities" include,

*inter alia*, "[r]esponding appropriately to supervision, co-workers and usual work situations"

and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.921(b)(5),(6).  "An

impairment is not severe only if the abnormality is so slight and its effect so minimal that it

would clearly not be expected to interfere with the individual's ability to work, irrespective

of age, education or work experience."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir.

1986).

Dr. George, the consultative clinical psychologist, gave plaintiff Axis I diagnoses of:

(1) Major Depressive Disorder, Single Episode; (2) Attention Deficit Hyperactivity Disorder,

Not Otherwise Specified; and (3) Intermittent Explosive Disorder.  (R. 142).  He determined

that plaintiff "would be severely impaired in her ability to relate [to] co-workers and

supervisors, and cope with job stresses and job changes because of her anger control

difficulties, impulsivity, and her depression."   (Id.).[4]   At the hearing before the ALJ,

plaintiff's counsel argued that these diagnoses and Dr. George's conclusion of a severe

limitation in basic work activities demonstrated that plaintiff met Listing 12.05C.  (R. 196).

The ALJ credited plaintiff's allegations regarding anger control and impulsivity to the

extent that he found that they cause her to have moderate limitation in social functioning

which, in a work setting, involves responding appropriately to supervisors and cooperating

with coworkers.  See 20 C.F.R. 404, Subpart P, App. 1, ¶ 12.00(C)(2).  If this moderate

---

[4]  The ALJ found the analysis of the medical evidence by Dr. Stonecypher, a non-examining physician to be "persuasive" and stated that Dr. Stonecypher's report was consistent with Dr. George's psychological evaluation.  However, as to this critical conclusion regarding severe limitations, Dr. Stonecypher disagreed with the examining psychologist. (See R. 167).

limitation of function with regard to this basic work activity results from a mental disorder other than mild mental retardation, plaintiff's condition meets Listing 12.05C.

The ALJ rejected plaintiff's contention that she suffers from the severe impairment of depression because: (1) "[t]he medical evidence is devoid of any diagnosis of depression other than the single episode"; (2) "[t]here is no indication that the claimant has ever sought treatment for depression;" and (3) there is no evidence that she has "ever been hospitalized for a mental impairment." (R. 21).[5] The ALJ notes that Dr. George's diagnosis of depression is the only such diagnosis in the record. However, two weeks following that diagnosis, plaintiff sought treatment from Samson Primary Care for complaints of sleep problems; the physician's assessment was "Anxiety-Dep." (R. 144). Additionally, Dr. George's diagnosis of "single episode" depressive disorder does not suggest that the diagnosed depression was not ongoing at the time of the evaluation; this is clear from Dr. George's recommendation that plaintiff pursue treatment for depression.[6]

The ALJ accurately notes that the record contains no evidence that plaintiff was ever hospitalized for depression. However, depression may cause more than slight or minimal functional limitations without reaching a level sufficient to require hospitalization. Additionally, the ALJ's reliance on plaintiff's failure to seek treatment for depression is

---

[5] The ALJ did not address whether plaintiff suffers from "severe" mental impairments of Attention Deficit Hyperactivity Disorder or Intermittent Explosive Disorder, as diagnosed by the consultative examiner.

[6] See also DSM-IV-TR at 369 ("The fourth digit in the diagnostic code for Major Depressive Disorder indicates whether it is a Single Episode (used only for first episodes) or Recurrent. It is sometimes difficult to distinguish between a single episode with waxing and waning symptoms and two separate episodes. For purposes of this manual, an episode is considered to have ended when the full criteria for the Major Depressive episode have not been met for at least 2 consecutive months.").

problematic.  The ALJ twice referenced this failure, apparently relying heavily upon it.  (See R. 21; see also R. 19 ("[S]he did not go to Spectracare for any type of psychological care for her alleged mental impairment.").  As noted above, plaintiff testified at the hearing before the ALJ that she sought treatment at SpectraCare but was unable to keep her appointment because she did not have the money to pay for it.  (R. 203).  She also testified that she has a problem with transportation, and indicated that she was unable to fill a prescription for her back because she did not have the money.  (R. 202).  The ALJ did not ask any follow-up questions regarding these issues and did not address them in his decision.  If plaintiff had a good reason for failing to seek medical treatment, that failure may not constitute a sufficient basis for rejecting her allegations of symptoms of depression.  Cf. SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to . . . question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment . . . [f]or example[,] . . . [t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services.").  Because the ALJ did not further question plaintiff about her reasons for failing to seek treatment for her alleged depression, and because he did not address this issue in his decision, the court is unable to conclude that the ALJ's conclusion that plaintiff does not suffer from "severe" depression is supported by substantial evidence.

## **CONCLUSION**

For the foregoing reasons, the decision of the Commissioner is due to be REVERSED

and this case REMANDED for further development of the evidence.  A separate judgment

will be entered.

DONE, this 2nd day of February, 2007.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE